IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | &#124; |
| v. | &#124;   CRIMINAL CASE NO. |
| WAYNE ELLIOTT, | &#124;   1:19-CR-00278-4-LMM-JSA |
| Defendant. | &#124; |

## REPORT AND RECOMMENDATION

Defendant allegedly consented to a warrantless search and made statements to law enforcement as part of an early-morning visit to his home. Defendant moves to suppress the statements and results of the search, alleging among other things that his actions were not voluntary because he was intoxicated.

After an evidentiary hearing, the Court finds that although Defendant was under the influence of drugs and/or alcohol during the encounter, he retained the ability to understand the situation and make a free and rational choice to cooperate with the officers and consent to the search. The Court also finds that Defendant's statements were not obtained in violation of *Miranda v. Arizona*. For these and other reasons discussed below, the Court **RECOMMENDS** that the Motions [72][74][82] be **DENIED**.

## I.    FACTS

The following facts were obtained during the evidentiary hearing on January 29, 2021. *See* Transcript [165] ("Tr.").

On the night of June 1, 2019, Investigator Kyle Lawrence of the Catawba County (NC) Sheriff's Department received a call from a fellow member of the U.S. Drug Enforcement Administration ("DEA") Task Force officer, explaining that the DEA in Atlanta had intercepted communications showing that an individual named Kevin Brown would be delivering methamphetamine to the Defendant at his home in North Carolina. Tr. at 14-15. Lawrence was part of a group of at least seven or eight law enforcement agents who then went to Defendant's house in Marion, NC, at about 1:45 a.m. that night (i.e., the morning of the 2nd). *Id*. at 15-16.

Defendant's property has driveways with two exits on the street. The officers entered and parked in one of those driveways. No vehicles had police lights or sirens activated. *Id*. at 16-18. Lieutenant McGinnis initially went to the front door of the house and encountered Defendant. *Id*. at 19, 90-91. McGinnis told the Defendant that some other officers would like to talk with him, and directed him to Lawrence, who was standing a short distance away. *Id*.

Upon meeting Defendant, Lawrence told him "who I was and why I was there, that we knew that Mr. Brown was delivering methamphetamine to him from

Atlanta." *Id*. at 20. Lawrence was wearing a vest that identified himself as law enforcement, and he was carrying a firearm at the time. *Id*. But Lawrence was not wearing tactical gear, and at no time during the events of June 2 did he ever draw his weapon or observe any other officer do so. *Id*. at 20-21. There was a K-9 unit at the scene. *Id.* at 54.

Lawrence asked Defendant if he wished to cooperate with the officers, to which Defendant responded "yes." *Id*. The officers first asked Defendant if they could search his person, to which he responded "yes." *Id*. at 21. The officers searched him and found a glass pipe used to smoke methamphetamine and a hypodermic needle. *Id*. The officers did not seize the materials but rather left them sitting on a railing by the side of the house. *Id*. at 22. The officers asked Defendant if there were other people and any weapons in the house, and Defendant responded "yes to both" questions. *Id*. The officers also asked Defendant if they could enter the house, and he said "yes." *Id*. at 23. The officers entered the house, encountered two females, and asked them to come outside, which they did. *Id*. There was another individual that Defendant indicated was in the house who could not be immediately located, so Defendant called out to the individual to locate him. *Id*. at 23-24.

At the officers' request, Defendant also pointed out where within the house firearms could be located, and the officers then engaged in an initial sweep to

obtain those firearms. *Id*. at 24. The officers found two of the three firearms that Defendant had described but "we couldn't find the third which I believe was a rifle because the house was so cluttered, and then we secured the firearms in an area and checked to make sure that they weren't stolen and just general law enforcement practice." *Id*. at 24. After confirming that the guns were not stolen, the officers returned them to Defendant later that morning. *Id*. at 25.

Lawrence then spoke with the Defendant along with Task Force Officer John Martin. *Id*. "We spoke some outside, and then we stepped inside so the other individuals couldn't hear what we were talking about." *Id*. Defendant was not restrained or told that he was under arrest at any point during this encounter. *Id*. at 25-26. At some point Defendant asked whether he was being arrested, and the officers told him that he was not. *Id*. at 41. No *Miranda* warnings were issued on June 2. *Id*. at 26. The officers did not raise their voices, make any threats or promises, or lay hands on Defendant other than to frisk and search him. *Id*. at 41.

Lawrence recorded a part of the conversation as a voice memo on his phone, but only began recording in the middle of the conversation after he and Martin took the Defendant inside the house. Lawrence discovered later that the phone recording cut off for some unknown technical reason after about ten minutes. Tr. at 30; Ex. 4. Neither Lawrence nor, to his knowledge, any other officer was equipped with a body camera at this time. *Id.* at 30-31.

4

The officers asked Defendant "where the money was that Mr. Brown would be receiving for delivering the methamphetamine that he was coming out with." *Id*. at 26. Defendant at first stated that he (Defendant) was receiving the drugs on a "front." *Id*. Lawrence indicated that he did not believe that claim to be likely, and Defendant "then changed his story to that there was only $5,000 that he was paying." *Id*. at 28. Defendant said that the money was in "the woods," and he offered to go out on a four-wheeler into the woods to retrieve the money. *Id*. at 28. Officer Lawrence "asked that we not get on a four-wheeler just because of the time of night in respect to the other neighbors in the area," and offered instead that they all go walk. *Id*. at 28-29. Defendant, however, ultimately told Martin to go into the kitchen and check the stove and oven. *Id*. When the officers did so, they discovered and seized a large amount of cash. *Id*. The Defendant said that the money would be bound in $1,000 stacks. *Id*. at 40. The officers did not expressly ask permission to take the money, and at one point the Defendant made the comment, which the officers perceived as in a joking manner, "you're just going to come up here and take my money and leave?" *Id*. at 39-40.

During the conversation with Martin and Lawrence, Defendant discussed things such as the manner in which Kevin Brown would typically hide methamphetamine in his vehicle, and the sorts of drugs that Defendant uses. *Id*. 34-35. Defendant indicated that he did not want anyone else to know that he was

5

cooperating with the investigation. *Id.* at 37. At some point, Defendant asserted that all of the drugs were for personal use. *Id*. Lawrence, however, pointed out that the amount being transported by Brown was a kilogram worth of methamphetamine, which could not be for personal use. *Id*.

At some point, Lawrence asked the Defendant whether he (Lawrence) could look at the Defendant's phones. *Id*. at 37. The Defendant agreed. *Id.* Lawrence asked the Defendant to identify which phone he (Defendant) used to communicate with Kevin Brown, and the Defendant complied. *Id*. at 38. Lawrence indicated that he would need to retain that phone, but he returned the other phone to the Defendant (after having first reviewed it and confirming that there were no communications with Brown on that phone). *Id*. When the officers left the Defendant's residence, they took Defendant's phone and the bundled stacks of cash found in the oven. *Id*. at 39-40. They left at approximately 3:00 a.m., just over one hour after arriving. *Id*. at 40-41. Defendant was not arrested and he indicated that he would meet with the officers again on a future date to continue to discuss the investigation. *Id*.

Lawrence acknowledged that during the encounter Defendant "appeared to be under the influence, but I couldn't tell if it was alcohol or methamphetamine use." *Id*. at 35. Lawrence observed containers of alcohol and could smell alcohol. Defendant even offered a drink to the officers, who declined. *Id*. at 37. Lawrence

also was aware that Defendant had substance abuse and addiction problems. Tr. at 60. Defendant himself testified at the hearing that he had smoked or injected at least half a gram of methamphetamine that evening. Tr. at 166. Indeed, Defendant's pretrial bond was later revoked because of drug use while on bond. *See* Docs. 124, 125.

Generally, however, Defendant appeared "normal acting" to Lawrence. *Id*. at 43. According to Lawrence, the Defendant "directly answered any questions that I asked him and appeared to fully understand what was going on." *Id*. at 43. Lawrence also testified that Defendant was steady on his feet. *Id*. However, Lawrence also later acknowledged, on cross-examination, that there was a point where Defendant accidently knocked something over, and the officers made a joke to the effect that, "that's the Crown doing that to you," referring to Crown Royal liquor. *Id.* at 70. Defendant also took a "big gulp" out of a liquor bottle while the officers were there in the house. *Id*. at 70-71. Defendant asked the officers for permission before doing so. *Id*. at 133. Another officer, Conger, testified that Defendant was "super chatty," which could have been consistent with being intoxicated, but could have just been nervousness or "just [Defendant's] personality." *Id*. at 120

At some point, Defendant struck up a conversation with Officer Martin about Officer Martin's firearm. *Id*. at 39. Defendant indicated that he had some

magazines that would apparently fit that gun, and he offered to give those magazines to Martin. Martin declined. *Id*. Although Lawrence testified that Defendant did not "jump around a lot in the conversation," Lawrence acknowledged that the somewhat odd discussion about Martin's gun and magazine did not naturally follow from the conversation. Tr. at 81.

As noted above, the agents did not arrest Defendant that evening although they did seize the cash and one of Defendant's phones. Officers returned on June 11, 2019 to attempt to talk further with Defendant—this time in the middle of the day—and Defendant refused to talk. *Id.* at 45. Eventually, the officers obtained a federal arrest warrant for Defendant, and arrested him on August 6, 2019. Officer Martin acknowledged that he did not initially read Defendant any *Miranda* warnings for at least minutes after placing Defendant in custody that day. *Id*. at 136-137, 154. The officers placed Defendant in the front seat of the police car as they transported him to jail. *Id*. At some point during this process, and before any *Miranda* warnings were issued, Defendant stated to Officer Martin that "I [Martin] was more cool and laid back [presumably than other officers]," and that "he wouldn't mind working with me in the future." Tr. at 155. At that point, Martin told Defendant to "hang on a minute," and Martin then read Defendant his *Miranda* rights. *Id*.

## II.   *ANALYSIS*

### A. Compliance with *Miranda v. Arizona*

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of his right to the assistance of counsel prior to any interrogation by law enforcement. The Supreme Court made clear that "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests upon the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id*. at 475.

It is the Defendant's burden to demonstrate that he was in "custody" and subjected to interrogation and that *Miranda* thereby even applies. *See United States v. de la Fuente*, 548 F.2d 528 (5th Cir. 1977); *see also United States v. Peck*, 17 F.Supp.3d 1345, 1353-55 (N.D. Ga. 2014). The Supreme Court in *Miranda* explained that custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda*, 384 U.S. at 444. The Court subsequently defined "custody" in this context as a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *See California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted).

The Supreme Court has provided a non-exhaustive list of factors courts should consider in determining whether a suspect is in "custody" for purposes of Miranda:

> As used in our Miranda case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, considering the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave. And to determine how a suspect would have gauge[d] his freedom of movement, courts must examine all the circumstances surrounding the interrogation. Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.

*Howes v. Fields*, 565 U.S. 499, 508 (2012).

a. *June 2, 2019 Statements*

Here, it is undisputed that the officers failed to advise Defendant of his *Miranda* rights at any time during the encounter on June 2, during which encounter Defendant made several incriminating statements about this drug transactions with Kevin Brown. The Government, however, argues that *Miranda* did not apply because Defendant was not in custody during that encounter. It is undisputed that Defendant was never arrested on that night. He argues, rather, that he was subjected to the same restrictions on movement associated with a formal arrest and therefore that *Miranda* applied.

The Court finds that Defendant does not meet his burden to show that he was in custody on June 2. Indeed, Defendant himself asked the officers whether he was being arrested and they told him that he was not. Otherwise, he was not restrained, subject to any threats or language with threatening tone, or physically handled except insofar as the agents briefly frisked him with his consent at the inception of the encounter. The evidence shows that the conversation was polite and conversational. The incident also occurred in Defendant's own home and lasted a little more than just one hour. While numerous police vehicles and officers were present, those facts did not convert this encounter into an arrest.

Defendant points out that the officers denied him a request to drive into the woods on a four-wheeler. The evidence is somewhat more limited, however. Lawrence's testimony was that he suggested that they walk instead, because a four-wheeler might be too noisy at that hour for the neighbors. Nothing about this exchange would suggest that the incident had risen to the level of a formal arrest.

Defendant also argues that when another occupant tried to leave the property, the officers specifically instructed Defendant to call that person back. *See* Def. Br. [172] at 8. Again, the evidence is more limited. Lawrence's testimony is that he asked Defendant "where [the other occupant] was," and that Defendant then "took it upon himself to start calling for the person." *Id.* at 53-54. The testimony does not state that the officers directed Defendant to call out for this person or to

tell the person to come back to the house. *Id.* In any event, that officers might exert some limited restrictions over the movements of unknown individuals, particularly in the context of this late-night encounter, is consistent with this encounter being at most a limited investigative seizure, which is not an arrest and does not trigger *Miranda* rights.

Defendant also points out that he asked the officers permission before taking a drink during the encounter. While the officers did not deny him that permission, Defendant cites this fact as evidence that he (Defendant) subjectively believed he was in the officers' custody at this time. The Court disagrees with the import of this rather innocuous fact, which is also consistent with this being at most a limited investigative encounter. The Court has considered the record as a whole and all the arguments advanced by the Defendant and finds that he has not established his custodial status for purposes of *Miranda* as of June 2, 2019.

b. *August 6, 2019 Statements*

By contrast, it is undisputed that Defendant had been formally arrested on August 6, 2019 by the time he stated to Officer Martin that he (Defendant) found Officer Martin to be "more" laid-back, and that he (Defendant) would be willing to cooperate and work with Officer Martin.

However, not all police questioning rises to the level of "interrogation" as prohibited by *Miranda*. "[O]nly questions that are reasonably likely to elicit

incriminating information in the specific circumstances of the case constitute interrogation within the protections of *Miranda*." *United States v. Bogle*, 114 F.3d 1271, 1274 (D.C. Cir. 1997). "The term interrogation under *Miranda* refers not only to express questions, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Here, Officer Martin did not say or do anything to elicit any incriminating response from Defendant. Officer Martin, rather, simply arrested Defendant, placed him in the car and started transporting him to jail. At that point, Defendant blurted out the statements noted above. The Court cannot find that the act of placing Defendant in the passenger seat of the car and otherwise simply driving him to jail constitutes "interrogation" within the meaning of *Miranda*. Indeed, after Defendant volunteered the largely innocuous statements about Officer Martin being "laid-back," Martin immediately stopped the conversation and advised Defendant of his rights. While it would have been a better and more prophylactically protective practice for Martin to have read the Defendant his rights earlier in the arrest, the Court finds no ground for suppression of these statements on the basis of *Miranda*. *See generally Cannaday v. Duggar*, 931 F.2d

752, 754 (11th Cir. 1991) (spontaneous utterances by Defendant, not prompted by police interrogation, not subject to suppression under *Miranda*).

### B. Voluntariness of Defendant's Consent to Search and Incriminating Statements

Defendant's motion also challenges the voluntariness of his consent to search and of his statements to the officers.

A warrantless entry of an individual's home is presumptively unreasonable.[1] *See United States v. Tovar-Rico*, 61 F.3d 1529, 1534 (1995). Warrantless entries into and searches of such premises are permitted, however, where the prosecution proves that the police acted upon the voluntary and freely-given consent of a resident.  *See, e.g., United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989).

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *Id*. at 360. In considering whether a consent to search was voluntary, the Court must examine the totality of the circumstances. *Tovar-Rico*, 61 F.3d at 1535 (11th Cir. 1995); *see also United States v. Gonzalez*, 71 F.3d 819, 828-32 (11th Cir. 1996) (illustrating factors properly to be considered in totality of circumstances inquiry). Further, "'[t]he government bears the burden of proving . . . that the consent was not a function of

---

[1] Defendant affirmatively offered proof, which the Government did not contest, that he lives at and enjoys a privacy interest vis-a-vis the residence in Marion, NC that the officers visited and searched on June 2, 2019. *See* Tr. at 161-164. Thus, the Defendant has legal standing to contest the search at this location.

acquiescence to a claim of lawful authority but rather was given freely and voluntarily.'" *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (*quoting United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)). The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent." *Gonzalez*, 71 F.3d at 828 (*quoting Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)). *See also Florida v. Bostick*, 501 U.S. 429, 438 (1991) ("'Consent' that is the product of official intimidation . . . is not consent at all.").

> The Eleventh Circuit has identified a non-exhaustive list of relevant factors to consider when assessing the voluntariness of a consent to search: voluntariness of the defendant's custodial status, the presence of coercive police procedures, the  extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found.

U*nited States v. Blake*, 888 F.2d 795, 798-9 (11th Cir. 1989).

Relatedly, if a Defendant moves to suppress her incriminating statements to law enforcement, the Government bears the burden to show that the Defendant's statements were made voluntarily. *See Jackson v. Denno*, 378 U.S. 368 (1964). Determining whether a statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Jones*, 32 F.3d 1512, 1516 (1994); see

Arizona v. Fulminate, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted). Suppression is warranted for an involuntarily-made confession, even if the police complied with *Miranda* or *Miranda* did not apply.

Defendant argues that his consent to search and his statements to the officers on June 2 were made involuntarily, primarily because of his intoxication, along with other factors including that the late-night timing of the encounter and the inherent intimidation associated with the number of officers and vehicles that were present.

It is undisputed that a "a defendant's impaired mental state (whether drug induced or otherwise) may prevent that person from understanding the nature of his waiver...." *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). Nevertheless, "[t]he mere fact that the defendant had taken drugs prior to giving the statement does not render it inadmissible." *United States v. Taylor*, 508 F.2d 761, 763 (5th Cir. 1975). Rather, "[t]he evidence must show the defendant was so affected as to make his statement, after appropriate warnings, unreliable or

involuntary." *Id*.; *see also United States v. Korn*, 138 F.3d 1239, 1240 (8th Cir. 1998) (neither exhaustion nor intoxication will necessarily invalidate a Miranda waiver) *United States v. Smith*, 608 F.2d 1011, 1012 (4th Cir. 1979) (stating that "[t]he test of whether a person is too affected by alcohol or other drugs voluntarily and intelligently to waive his rights is one of coherence, of an understanding of what is happening," and affirming district court's denial of suppression motion where, despite defendant drinking "enormous quantities of alcohol" in the 24-hours prior to his confession, "he was sober enough to know where he was and to recognize who the people around him were."); *United States v. Reynolds*, 367 F.3d 294, 299 (5th Cir. 2004) (confession voluntary despite defendant's lack of sleep and methamphetamine use one hour before arrest because defendant was alert and cooperative during questioning and interrogating officer saw no indication of drug influence);  *United States v. Contr*eras, 372 F.3d 974, 977-78 (8th Cir. 2004) (confession voluntary despite defendant's recent methamphetamine and marijuana use because defendant appeared sober and no police coercion alleged); *United States v. Curtis*, 344 F.3d 1057, 1065-67 (10th Cir. 2003) (confession voluntary despite use of drugs and alcohol before questioning because defendant was lucid throughout and no police coercion alleged); *United States v. Cristobal*, 293 F.3d 134, 138, 143 (4th Cir. 2002) (confession voluntary despite questioning in hospital the day after defendant had emergency surgery while he was on painkillers).

Here, it is likely, and largely undisputed, that the Defendant had been drinking and probably smoking methamphetamine in the time before the police arrived on June 2. The Court, however, does not find any evidence that the officers engaged in coercion in that regard. While the officers arrived late at night, there is no reason to believe that they were purposefully trying to find Defendant in an intoxicated state. Rather, the testimony shows that they were reacting expeditiously to a call from DEA-Atlanta about a drug transaction that was supposed to happen that night. Indeed, when the officers next came to follow up on Defendant's cooperation and talk with him further, they came in the middle of the day.

Further, the unrefuted testimony from the officers was that, while Defendant may have been under the influence of something, he was able to understand and answer questions appropriately and appeared to be rational and coherent. Indeed, the record suggests that the Defendant understood the situation. He appropriately asked whether he was under arrest and told the officers that he wanted his cooperation to be kept quiet. He also appears to have attempted to minimize his involvement and/or even hide discovery of evidence. He claimed, apparently falsely, that Brown was providing him drugs on a "front," and not for cash. Then, perhaps backtracking, he told the officers that the money was in the woods. Only at some later point in the conversation did he ultimately acknowledge that stacks of bundles of cash were hidden in the oven. Defendant also at some point self-

servingly claimed that the drugs were for personal use, which was not consistent with the large amounts at issue. That the Defendant was attempting to downplay his culpability is suggestive of willfulness.

The Court accepts that Defendant's coordination may have been impaired to a degree. But the record has a whole does not show the level of intoxication and/or coercive conduct that vitiates voluntariness. Otherwise, the record shows that the officers asked Defendant whether he wished to cooperate (to which he agreed), that they asked him whether they could search him (to which he agreed), that they asked him whether they could review his phone (to which he agreed), that they asked him whether they could enter the house (to which he agreed), and that he himself directed them to search the kitchen oven area in response to questions about the location of cash. If anything, the record suggests that the Defendant, at least initially, believed that the combination of offering some cooperation while also minimizing his culpability would be his best strategy.

The Defendant also attempted to negotiate certain aspects of his cooperation, including that it be kept quiet. Tr. at 37. That the Defendant asked that his cooperation be kept quiet suggests that he believed he was not being forced or compelled into providing information, and that he believed he could place or request some conditions on his agreement to cooperate. *Id.* The Court concludes,

therefore, that the Defendant's statements to the officers and consent to the searches were made voluntarily.

## C. The Scope of the Search

Defendant separately argues that even if he were found to have voluntarily consented to the search of his home and his phone, he did not expressly consent to the seizure of his phone and the cash. This argument fails because, to the extent the officers were lawfully present via consent, their subsequent seizure of the phones and cash was permissible under the plain view doctrine.

"An officer may seize evidence that is in plain view despite the failure to obtain a search warrant if two elements are satisfied: (1) lawful access to the object seized, and, (2) the incriminating nature of the object seized is immediately apparent." *U.S. v. Hromada*, 49 F.3d 685, 690 n. 11 (11th Cir.1995) (*citing Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)); *accord Harris v. U.S.*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) ("[O]bjects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence."). Here, the officers' lawful access is established by the Court's findings on the threshold issue of consent, as discussed above. The record at the hearing also establishes that the incriminating nature of these materials was apparent.

As for the phone, the officers arrived at Defendant's home because they learned, through wiretap interceptions, that Kevin Brown was delivering methamphetamine to Defendant at that location. Defendant verbally confirmed these facts. The officers seized and retained the phone precisely because the Defendant specifically identified it as the phone that he used to communicate with Kevin Brown. Thus, the officers knew that this phone had been used to arrange drug transactions, and thus was incriminating evidence. Indeed, the officers returned another phone to Defendant. But the phone they seized was clearly subject to seizure under the plain view doctrine, as apparent incriminating evidence. *See U.S. v. Jaimez*, 15 F.Supp.3d 1338, 1343 (N.D. Ga. May 21, 2013) (incriminating nature of cell phones found during a drug investigation was immediately apparent, justifying seizure under the plain view doctrine, where the officers knew from wiretaps that the drug transactions at issue involved phone communications, and where they saw multiple cell phones in the open, thus "suggesting in this context that the phones were used for drug sales.") (Totenberg, J.); *United States v. Rodriguez-Alejandro*, 664 F.Supp.2d 1320, 1345 (N.D.Ga. Oct. 19, 2009) (finding that the incriminating nature of four cell phones, lying out in the open, was immediately apparent in the context of a drug trafficking wiretap investigation) (Thrash, J.). *See also United States v. Diaz,* 494 F.3d 221, 226 (1st Cir.2007) (affirming district court's denial of motion to suppress seizure of cell phone on the

basis of the "plain view" exception); *United States v. Santillan,* 571 F.Supp.2d

1093, 1100–1101 (D.Ariz. 2008) (finding seizure of cell phone justified under

plain view exception where "officers had good reason to believe the phone was

being used in the furtherance of a drug-trafficking crime" and citing authority for

proposition that "cell phones and pagers in drug-trafficking investigations may

come within the plain view exception to the warrant requirement as items akin to

contraband, in that they are often tools of the drug-trafficking trade.").

Likewise, the incriminating nature of the large amounts of packaged and

bundled cash hidden in the oven was also readily apparent. *See Jaimez*, 15

F.Supp.3d at 1343-43 ("[T]he incriminating nature of the packaged cash was

immediately apparent."); *see also U.S. v. Chandler*, 437 Fed.Appx. 420, 428 (6th

Cir. 2011) (collecting cases and holding that "the incriminating nature of the

currency was immediately apparent" (internal quotation marks omitted)). In a drug

trafficking case involving the suspected purchase of substantial amounts of

methamphetamine, the presence of large amounts of bundles of cash hidden in an

oven is obviously incriminating. Moreover, Defendant himself pointed the officers

to this cash as part of a conversation in which they were asking him about the

location of the money by which he would pay Kevin Brown for the delivery of

narcotics.

**CONCLUSION**

Defendant's Motions [72][74][82] should be **DENIED**. This matter is

**READY FOR TRIAL**.

IT IS SO **RECOMMENDED** this 18th day of May, 2021.

 

 

_____
**JUSTIN S. ANAND**
**UNITED STATES MAGISTRATE JUDGE**